UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___5│14│10
```

PARKER WAICHMAN ALONSO LLP,
           Plaintiff,

           -against-                                    09 Civ. 7401 (CM)

THE ORLANDO FIRM, P.C.,
           Defendant.

_____ x

## DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS

McMahon, J.:

Plaintiff Parker Waichman Alonso LLP ("Plaintiff") is a law firm that has owned
and used the domain name "yourlawyer.com" since 1999, and has spent millions
promoting its legal services under the marks YOURLAWYER and
YOURLAWYER.COM. Plaintiff filed this action on August 21, 2009, alleging
trademark infringement and unfair competition arising from The Orlando Firm, P.C.'s
("Defendant") creation and use of the registered domain name "yourlawyer.tv" since
early 2007. On October 15, 2009, Defendant filed a motion to dismiss for lack of
personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).

For the reasons set forth below, the motion to dismiss is denied.

### BACKGROUND

**Plaintiff and its website "www.yourlawyer.com"**

Plaintiff Parker Waichman Alonso LLP is a New York limited liability
partnership doing business at 111 John Street, 14th Floor, New York, NY 10038.
(Compl. ¶ 2.) Plaintiff also maintains offices in Edison, NJ, and Bonita Springs, FL.

(Decl. of Herbert Waichman, Dec. 14, 2009 ("Waichman Decl.") ¶ 2.)  Plaintiff claims to be one of the leading "plaintiffs' firms" in the country (Compl. ¶ 10), representing victims nationwide in a variety of mass tort actions, including product recall cases. (Id.; Waichman Decl. ¶ 3.)

Since February 1999, Plaintiff has owned and used the domain name yourlawyer.com (Reg. No. 2156909). (Compl. ¶ 11.)  Plaintiff, through its predecessor-in-interest, acquired the domain name and the goodwill appurtenant thereto from James A. Dunlap, Jr.  This registration cited the date of first use as May 15, 1997. (Id. ¶ 14.) Plaintiff has also registered the marks YOURLAWYER® (Reg. No. 3510267) and YOURLAWYER.COM® (Reg. No. 3210791)[1] with the United States Patent & Trademark Office, and uses them to market its legal services nationwide. (Id. ¶¶ 11, 13.) The marks are embodied in Plaintiff's domain name, prominently featured on its website, and included on all business-related documents such as letterhead and business cards. (Id. ¶ 15.)

Plaintiff spends millions of dollars each year promoting and marketing its website and the services offered under the two marks. (Id. ¶ 16.)  Plaintiff alleges that the marks have become strong and recognizable as a result of Plaintiff's long-standing use of the marks and its success in advertising them. (Id. ¶¶ 16-17.)

Plaintiff's website www.yourlawyer.com serves as its internet home site. (Id. ¶ 12.)  The website also provides relevant legal updates, injury alerts, National Institutes of Health ("NIH") and Food & Drug Administration ("FDA") information,

---

[1] Plaintiff's complaint includes two different registration numbers for the YOURLAWYER.COM mark.  It appears one is the registration number for the trademark that Plaintiff acquired from James A. Dunlap, Jr. (Reg. No. 2156909), and the other is the registration number that Plaintiff received when it registered the mark with the U.S. Patent & Trademark Office (Reg. No. 3210791).

2

Environmental Protection Agency ("EPA") and product warnings and product recall notices. (Id. ¶¶ 11-12.) Plaintiff alleges that the website receives, on average, over 6000 views per day (id. ¶ 12), and has provided Plaintiff with name recognition throughout the country and facilitated the retention of many of its clients (Waichman Decl. ¶ 5).

### Defendant and its website "yourlawyer.tv"

Defendant Orlando Firm, P.C. is a Georgia professional corporation with its principal place of business at 315 W. Ponce de Leon Avenue, Suite 400, Decatur, GA 30030. (Compl. ¶ 3.) It also has an office in Morristown, NJ. (Decl. of Roger Orlando, Oct. 15, 2009 ("Orlando Decl.") ¶ 2.) Defendant states that the three attorneys in the firm are collectively licensed to practice in Georgia, New Jersey, the District of Columbia, Florida, Hawaii and the federal courts in Arkansas; none has ever been licensed to practice in New York. (Id. ¶¶ 4-5, 7.)

Defendant is also a firm that represents victims in mass tort actions—it offers the same type of legal services as Plaintiff. (Compl. ¶ 23.) Defendant testified that the parties have worked on the same mass tort matters and "travel in the same circles." (Pl.'s Ex. E (Deposition of Roger Orlando, Nov. 30, 2009 ("Orlando Dep.") at 16:6-7).) The parties consider themselves to be part of "a network" or "the same group" of mass tort attorneys practicing in the United States. (Waichman Decl. ¶ 8; Orlando Dep. at 16:6-17, 99:5-14.) Roger Orlando, the principal and the sole shareholder of Defendant, has known about Plaintiff since around 1999 (Orlando Dep. at 15:25-16:4), and the parties "share a mutual business partner in other legal matters" (Id. at 16:12-19). Orlando has met one of Plaintiff's partners, Frank Parker, and has spoken on the phone with another, Herb

3

Waichman, though it is unclear in what context these events occurred. (Orlando Dep. at 16:8-17:2.)

Defendant acknowledges that its attorney, Orlando, has traveled to New York for business reasons. (Orlando Dep. at 53:10-53:21). Orlando has taken depositions and conducted settlement negotiations in New York for cases filed in other jurisdictions, including the settlement of a class action for $7 million. (Id. at 53:8-16, 75:4-76:8.) Orlando has also attended a mass torts convention in New York for the purpose of promoting the firm's reputation "in front of the big guys' presence," though he claims it was primarily for the purpose of attracting business in Georgia. (Id. at 94:20-98:25.) But Defendant does not own a bank account or property in New York, and does not file taxes in New York. (Id. at 57:20-58:1; Orlando Decl. ¶ 14.)

On February 5, 2007, Defendant registered the domain name yourlawyer.tv (Compl. ¶ 19). Orlando states that he is "95 percent sure [he] knew" that Plaintiff operated www.yourlawyer.com at that time, since both parties marketed for the same mass tort actions and Defendant would see Plaintiff's website on Google-sponsored links. (Orlando Dep. at 25:6-26:20.) Defendant's domain name encompasses Plaintiff's YOURLAWYER mark in its entirety, and is only distinguishable from Plaintiff's YOURLAWYER.COM mark by the web extension ".tv" (as opposed to ".com"). (Id. ¶ 21.) Defendant's domain name opens up to the website "www.orlandofirm.com." (Id. ¶ 20; Orlando Dep. at 156:22-157:4.) Email extensions at Defendant's firm utilize the www.orlandofirm.com web address. (Compl. ¶ 20.)

The website states, "Although headquartered in Decatur, Georgia, The Orlando Firm, P.C. handles serious injury cases and class action lawsuits across the country."

4

(Compl. ¶ 5; Pl.'s Ex. D at 2.) It advertises Defendant's practice of retaining local counsel free of charge when it handles cases in jurisdictions where its lawyers are not licensed to practice, so that Defendant can personally handle or maintain close oversight of the case. (Compl. ¶ 6; Pl.'s Ex. D at 2.) The website contains no specific references to New York (Orlando Dep. at 58:3-10), however, like all websites, yourlawyer.tv is accessible for viewing by New York residents.

The website permits viewers (some of whom are prospective clients) to exchange information with Defendant in two ways. First, the website provides potential clients the ability to send messages and information to Defendant through a "Contact Us" box. (Orlando Dep. at 41:3-12.) Second, the website offers a "Contact Us Live" option, which notifies the website viewer whether Defendant is online or offline. (Id. at 41:19-22.) This is what is known as an "instant messaging" mechanism. (Id. at 41:19-42:3.) Though Defendant's brief argues that these inquiries or messages are not guaranteed a response (Def.'s Mem. of Law in Supp. of Def.'s Mot. to Dismiss, at 2), Orlando testified in his deposition that it is "absolutely" Defendant's practice to "respond to every one of these inquiries or emails" (id. at 42:19-43:2). Once Defendant receives a message, a lawyer or paralegal will then "call and interview the person," and if Defendant decides to take on the person, it will "mail or sometime[s] Federal Express" packages so Defendant can "place that person under contract and begin handling their legal matter." (Id. at 43:15-25.)

### Defendant's representation of New York residents

During February and March of 2007, Plaintiff, in conjunction with another law firm Neblett, Beard & Arsenault LLP, filed two lawsuits relating to peanut butter recalls:

one in Louisiana state court, and the other in a federal court in Mississippi. (Waichman Decl. ¶ 13.) After filing each of these actions, Plaintiff issued press releases that offered free case evaluations for anyone who became ill after eating contaminated peanut butter. The press releases included Plaintiff's www.yourlawyer.com web address. (Id.) Plaintiff represented a number of clients in connection with this matter, including many clients from New York. (Id. ¶ 12.)

Defendant registered the yourlawyer.tv domain name on February 5, 2007. (Compl. ¶ 19; Orlando Dep. at 155:11-23.) Soon after, between February 19, 2007, and March 2, 2007, six New York residents contacted Defendant about its peanut butter recall case, and were ultimately represented by Defendant. (Pl.'s Ex. F; Waichman Decl. ¶ 11.) After speaking on the phone with them, Defendant sent "sign-up packages" to them in New York containing contingent fee contracts and medical release forms, which were then signed and returned to Defendant (Id. at 108:25-109:4, 118:6-22.) Other potential clients from New York contacted Defendant as well, but Defendant ultimately "turn[ed] [them] away" and chose not to represent them. (Id. at 45:8-17.)

Defendant did not ask these six New York residents during the intake interview how they learned of Defendant (Orlando Dep. at 43:3-6), though it believes the six clients discovered its firm through Google and as a result of its own "campaign blitz" during that time (id. at 66:25-67:12, 78:23-80:5). Defendant stated that it had not yet begun using yourlawyer.tv in the marketing sense until after the February 19, 2007 to March 2, 2007, timeframe. (Orlando Dep. at 156:3-25.) As a result, Defendant does not know whether a Google search of yourlawyer.tv would have returned the www.orlandofirm.com website during this time. (Id. at 157:5-158:5.) Defendant does know that another of its websites,

6

"www.recalls-peanutbutter.com," was "on Google," and therefore believes that no New York individuals would have contacted it through www.orlandofirm.com or yourlawyer.tv, which Defendant believes were not "out on Google." (Id. at 78:23-80:5.) However, Defendant admits that he does not know "how Googling works" or if yourlawyer.tv was ever "signed up with Google." (Id. at 157:5-25.) Defendant also admits that yourlawyer.tv was activated and immediately accessible after registration, and a viewer who directly typed in "yourlawyer.tv" on February 6th or 7th would have been taken to www.orlandofirm.com. (Id. at 155:24-157:4.)

In response to one of Plaintiff's document requests, Defendant was only able to produce one direct email from a New York client. (Id. at 140:3-25.) Orlando testified that the firm could not produce any emails or messages from or around February 2007 regarding the six New York clients because it at some unspecified date "purged the initial onslaught of hundreds . . . of emails" during this time; it was "too much in [Orlando's] system." (Id. at 141:2-7.) Defendant acknowledges it is possible that some of those purged emails were from New York residents—either one of the six New York residents that Defendant represented, or other potential clients that it did not represent. (Id. at 141:11-20.) Defendant also provided documents detailing site visits to its website from New York computers between May and November 2009. (Pl.'s Ex. G.) However, Orlando has not produced, and does not believe the firm can produce, similar information for any dates prior to May 2009. (Orlando Dep. at 143:11-145:9.)

Plaintiff learned of yourlawyer.tv in early 2009. (Compl. ¶ 28.) Plaintiff contacted Defendant and requested that it transfer the domain name to Plaintiff. Plaintiff claims that Defendant agreed to make the transfer, but failed to do so. (Compl. ¶¶ 28-

7

29.) According to Orlando, Defendant was unable to do so because the website was "locked . . . down" after Plaintiff filed a complaint with the Internet Corporation for Assigned Names and Numbers ("ICANN") on or about April 1, 2009. (Orlando Dep. at 153:23-154:7.)

ICANN matters are governed by the Uniform Domain Name Dispute Resolution Policy ("UDRP"), and can be resolved by one of four arbitration service providers, including the National Arbitration Forum ("NAF"). See ICANN, http://icann.org (last visited April 22, 2010). Plaintiff submitted its complaint to NAF and commenced proceedings. (Orlando Dep. at 155:11-13); Parker Waichman v. Zany Technology.com, Claim No. FA0904001255465 (Nat'l Arb. Forum May 20, 2009), available at http://domains.adrforum.com/domains/decisions/1255465.htm. NAF determined that Plaintiff was not entitled to relief, even though it found that Defendant's website was confusingly similar to Plaintiff's, because Plaintiff failed to prove that Defendant registered and is using the domain name in bad faith, and that Defendant lacks rights or legitimate interests with respect to the domain name. (Id.)

Arbitration decisions governed by the UDRP are not binding on the courts, and do not preclude litigation in the courts. See General Media Commc'ns, Inc. v. Crazy Troll, LLC, No. 06 Civ. 40581, 2007 WL 102988, at *4 (S.D.N.Y. Jan. 16, 2007). In fact, the UDRP expressly allows for "independent resolution" of the parties' dispute in "a court of competent jurisdiction" after a UDRP proceeding has concluded. UDRP ¶ 4(k), available at http://www.icann.org/en/dndr/udrp/policy.htm; see also General Media, 2007 WL 102988, at *4 (citing Barcelona.com, Inc. v. Excelentisimo Ayuntamiento de Barcelona, 330 F.3d 617, 624 (4th Cir. 2003)). The phrase "a court of competent jurisdiction" is

given its plain meaning, "namely a[ny] court that has jurisdiction to hear the claim brought before it." Storey v. Cello Holdings, L.L.C., 347 F.3d 370, 380 (2d Cir. 2003). Therefore, the UDRP proceeding between the parties does not bar this action.

On August 21, 2009, Plaintiff filed this action with the U.S. District Court, Southern District of New York.

## DISCUSSION

### I.    Standard of Review

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant. Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 165 (2d Cir. 2005). The extent of this burden "varies with the procedural posture of the case." Kiobel v. Royal Dutch Petroleum Co., No. 02 Civ. 7618, 2009 WL 3817590, at *4 (S.D.N.Y. Nov. 16, 2009) (citing Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp. 2d 736, 757 (S.D.N.Y. 2004)). Where, as here, no evidentiary hearing has been held, but there has been discovery on the issue of personal jurisdiction, the plaintiff must make a "prima facie showing which includes an averment of the facts that, if given credit by the ultimate trier of fact, would be sufficient to establish jurisdiction over the defendant." Starmedia Network, Inc. v. Star Media, Inc., No. 00 Civ. 4647, 2001 WL 417118, at *2 (S.D.N.Y. Apr. 23, 2001) (citing Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999)); see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999).

"[T]he record on this motion goes beyond the complaint." Klonis v. Nat'l Bank of Greece, S.A., 492 F. Supp. 2d 293, 296 (S.D.N.Y. 2007). Because personal

jurisdiction is "inherently a matter requiring the resolution of factual issues outside of the pleadings . . . all pertinent documentation submitted by the parties may be considered in deciding the motion." St. Paul Fire & Marine Ins. Co. v. Eliahu Ins. Co., No. 96 Civ. 7269, 1997 WL 357989 (S.D.N.Y. June 26, 1997), aff'd, 152 F.3d 920 (2d Cir. 1998) (internal quotations omitted); see also APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003). All pleadings and affidavits must be construed in the light most favorable to the plaintiff, and where doubts exist, they must be resolved in the plaintiff's favor. See Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir. 1985).

Here, the parties have engaged in discovery limited to the issue of personal jurisdiction. (Mem. Endorsement, Docket No. 11 (Oct. 20, 2009).) Attorney Roger Orlando, the principal and the sole shareholder of the Defendant law firm, has answered interrogatories and been deposed. Defendant has responded to document requests by providing copies of its intake forms, contingent fee contracts and mailing slips for packages sent to several New York residents it has represented. Defendant has also provided documents showing the number of site visits to www.orlandofirm.com from New York viewers between May and November of 2009—directly and from yourlawyer.tv. Therefore, the Court will consider these materials in deciding this motion to dismiss.

## II.     Applicable Legal Standards

"District courts resolving issues of personal jurisdiction must . . . engage in a two-part analysis." Grand River, 425 F.3d at 165 (quoting Bank Brussels Lambert, 171 F.3d at 784); see also Best Van Lines, Inc. v. Walker, 490 F.3d 239, 242 (2d Cir. 2007). The Court must first determine whether the exercise of personal jurisdiction is appropriate

10

under the laws of the forum state.  Best Van Lines, 490 F.3d at 242; Grand River, 425 F.3d at 165.  Only if the answer is in the affirmative must a court then determine whether the exercise of jurisdiction is consistent with federal due process requirements.  Id.

### A.        Laws of the forum state

New York's long arm statute—New York Civil Practice Law and Rule Section 302(a) ("CPLR 302(a)")—governs the issue of personal jurisdiction.  Plaintiff asserts that jurisdiction exists under two separate provisions of the section: CPLR 302(a)(1) and CPLR 302(a)(3)(ii).

CPLR 302(a)(1) permits jurisdiction over an out-of-state defendant when (1) the defendant "transacts any business" in New York, and (2) the cause of action "aris[es] from" the business transaction.  See N.Y. C.P.L.R. 302(a)(1); Best Van Lines, 490 F.3d at 246.

CPLR 302(a)(3)(ii) permits jurisdiction over an out-of-state defendant when: (1) the defendant commits a tortious act outside the state; (2) the plaintiff suffers injury within the state; (3) the defendant expects or should reasonably expect its act to have consequences in the state; and (4) the defendant derives substantial revenue from interstate commerce.  N.Y. C.P.L.R. 302(a)(3)(ii).

### B.        Due process requirements

If either provision of CPLR 302(a) allows the exercise of personal jurisdiction, the Court must engage in a due process inquiry, which contains two parts: the minimum contacts inquiry, and the reasonableness inquiry.  "Minimum contacts exist where the defendant 'purposefully availed itself' of the privilege of doing business in the forum state and could 'reasonably anticipate being haled into court there.'"  Pearson Educ., Inc.

v. Shi, 525 F. Supp. 2d 551, 557 (S.D.N.Y. 2007) (quoting Burger King Corp. v.

Rudzewicz, 471 U.S. 462, 474-75 (1985)).

Although exercising jurisdiction is favored once the plaintiff has made a threshold

showing of "minimum contacts," "it may be defeated where the defendant presents 'a

compelling case that the presence of some other considerations would render jurisdiction

unreasonable.'" Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir.

1996) (quoting Burger King, 471 U.S. at 477). In determining whether the assertion of

jurisdiction is reasonable under the circumstances, i.e., comports with traditional notions

of fair play and substantial justice, a court considers five factors:

(1)   the burden that the exercise of jurisdiction will impose on the
      defendant;

(2)   the interests of the forum state in adjudicating the case;

(3)   the plaintiff's interest in obtaining convenient and effective relief;

(4)   the interstate judicial's [sic] system's interest in obtaining the most
      efficient resolution of the controversy; and

(5)   the shared interest of the states in furthering social substantive
      policies.

Kernan, 175 F.3d at 244 (internal quotations and citations omitted).

### III.   Plaintiff has Made a Prima Facie Showing of Personal Jurisdiction

#### A.   CPLR 302(a)(1)

Plaintiff has made a prima facie showing of jurisdiction under CPLR 302(a)(1),

which allows courts to exercise personal jurisdiction when (1) a defendant "transacts any

business" in New York, and (2) the cause of action "aris[es] from" the business

transaction. Best Van Lines, 490 F.3d at 246.

12

A defendant who "transacts business" must purposefully avail itself of the privilege of conducting activities within New York, thus invoking the benefits and protections of New York laws. See id. (citing McKee Elec. Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 382 (1967)). Even when the defendant never enters New York, proof of a single transaction or act is sufficient to invoke long-arm jurisdiction. Id. at 248 (citing Deutsche Bank Sec., Inc. v. Montana Bd. of Invs., 7 N.Y.3d 65, 71 (2006)).

Here, Defendant represented six New York residents in a mass tort action, which is plainly enough to find that Defendant transacted business in New York. Specifically, Defendant spoke on the phone with New York residents in order to collect information for intake forms, mailed FedEx "sign-up packages" to New York containing retainer and medical release forms that were signed and sent back, and ultimately acted as their counsel. New York courts have found that similarly situated out-of-state defendants had transacted business by retaining a New York attorney for legal services, or by soliciting a New York lawyer to provide legal advice and representation, then calling, emailing and faxing the lawyer. See id. at 247-48 (citing Elman v. Benson, 32 A.D.2d 422 (N.Y. App. Div. 2d Dep't 1969); Fischbarg v. Doucet, 38 A.D.3d 270 (N.Y. App. Div. 1st Dep't), aff'd, 9 N.Y.3d 375 (2007)).

The fact that the lawsuit was filed in Georgia is of no moment. In serving as counsel for its New York clients, Defendant "transacted business" *with them*; Defendant's business relationship with its New York clients did not change based on the fact that Defendant represented its New York clients in a case filed in another state. In Fischbarg v. Doucet, the court found that out-of-state defendants from California "transacted business" in New York based on, among other things, their "purposeful

attempt to establish an attorney-client relationship [in New York] and their direct participation in that relationship via calls, faxes and emails that they projected into this state over many months." Fischbarg, 9 N.Y.3d at 380. The out-of-state defendants had retained the New York attorney to represent them in an Oregon case. Id. at 377-78. Though Fischbarg involved an in-state attorney seeking to establish jurisdiction against its out-of-state client, it was the nature of the relationship (the attorney-client relationship) that was the basis for the court's finding of jurisdiction.

The cause of action in this suit plainly arises from Defendant's transaction of business with its New York clients. "[A] suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." Best Van Lines, 490 F.3d at 246 (citing Henderson v. INS, 157 F.3d 106, 123 (2d Cir. 1998)). Plaintiff alleges that Defendant's use of Plaintiff's mark on yourlawyer.tv infringes on Plaintiff's marks and suggests an affiliation between the two parties that confuses and deceives New York website viewers. Plaintiff believes that it could have represented Defendant's six New York clients in the peanut butter matter.

Alternatively, the Court can exercise transactional jurisdiction in this case based on the interactivity of Defendant's website. New York courts have identified a spectrum of cases regarding a defendant's use of the internet that are "useful for analyzing personal jurisdiction under section 302(a)(1) . . . insofar as it helps to decide whether the defendant 'transacts any business' in New York." Best Van Lines, 490 F.3d at 251-252; see also Citigroup Inc. v. City Holding Co., 97 F. Supp. 2d 549, 565 (S.D.N.Y. 2000). Where defendant merely makes information available on a "passive" website, there is no basis

14

for finding personal jurisdiction. But where a defendant transacts business through the website, by making sales or entering into contracts, personal jurisdiction may attach. See Citigroup, 97 F. Supp. 2d at 565. And where, as here, the defendant maintains an interactive website that permits the exchange of information with out-of-state customers, there may be a basis for jurisdiction, depending on the level and commercial nature of the exchange. Id.

In Citigroup, the website fell into the "middle ground" because it allowed viewers to click a hyperlink to chat with an online rep, to email with questions and receive a response, and to apply for loans online as well as print out applications that can be filled out by the viewers then faxed in. There, the court said the interaction was "significant and unqualifiedly commercial in nature." Id.

Defendant's website similarly provides mechanisms through which New York viewers can relay information or send messages: the "Contact Us" and "Contact Us Live" features. The website provides the first point of contact between prospective clients and Defendant, who then interviews them to determine whether it will represent them in its cases. Defendant's practice, as a plaintiffs' mass tort firm, is to initially "place under contract as many clients as possible . . . to bust a class," and then to "pick the better cases . . . that will result in an income." (Orlando Dep. at 112:2-16.) The exchange of information on Defendant's website is therefore unqualifiedly commercial, and Defendant has transacted business through its interactive website.

Plaintiff has met its burden of showing that personal jurisdiction can be exercised over Defendant under CPLR 302(a)(1).

### B.    CPLR 302(a)(3)(ii)

Plaintiff has also met its burden of establishing jurisdiction under CPLR 302(a)(3)(ii).

Defendant has allegedly committed a tortious act outside of New York. Defendant is headquartered in Georgia, and maintains an office in New Jersey. Defendant has allegedly infringed on Plaintiff's well-recognized marks by creating and using a website that fully encompasses or is very similar to Plaintiff's marks.

Trademark infringement is a tort for purposes of determining long-arm jurisdiction. "Where an Internet site displays allegedly infringing marks, the tort is deemed to be committed where the website is created and/or maintained." Starmedia Network, Inc. v. Star Media, Inc., No. 00 Civ. 4647, 2001 WL 417118, at *2 (S.D.N.Y. Apr. 23, 2001); see also Energy Brands, Inc. v. Spiritual Brands, Inc., 571 F. Supp. 2d 458, 470-71 (S.D.N.Y. 2008);

The second element, the requirement of "injury within the state," is satisfied by Plaintiff's claim of harm or threatened harm resulting from the confusion and deception of website viewers, who are among Plaintiff's potential clients.[2] See Energy Brands, 571 F. Supp. 2d at 471; Starmedia Network, 2001 WL 417118, at *2; Citigroup, 97 F. Supp. 2d at 568; Am. Network, Inc. v. Access Am./Connect Atlanta, 975 F. Supp. 494, 497 (S.D.N.Y. 1997). In American Network, a New York corporation using the mark "American.net" brought trademark infringement claims against a Georgia corporation

---

[2] The complaint never specifically alleges harm to New York viewers. But it is sufficient that Plaintiff's affidavit, brief and evidence focus on Defendant's six New York clients and other potential clients from New York who Defendant did not ultimately represent, and whom Plaintiff believes were mislead by Defendant's website. "Nowhere in the CPLR's rules of pleading is there any requirement of an allegation of the court's jurisdiction. Rather, if the defendant moves to dismiss [for lack of] personal jurisdiction, the plaintiff must come forward with sufficient evidence, through affidavits and relevant documents, to prove the existence of jurisdiction." Fischbarg, 9 N.Y.3d at 381 n.5 (internal quotations and citations omitted).

16

that provided similar services and had begun using the mark "America.net."  Id. at 495-96.  The court determined that the plaintiff's claim of harm in the New York market was sufficient to meet the statute's requirement of injury within the state.  Id. at 497.

In the closely analogous case at bar, both parties offer the same type of legal services: the representation of plaintiffs in mass tort actions.  Defendant's website (yourlawyer.tv) is practically identical to Plaintiff's website (www.yourlawyer.com). Plaintiff has alleged that Defendant's website has and will likely continue to mislead consumers across the nation—including those in New York—into believing that Defendant's services "emanate from or are otherwise affiliated" with Plaintiff.  (Compl. ¶ 24.)  To support this allegation, Plaintiff points to evidence that Defendant signed up six New York clients for a peanut butter recall action only weeks after Plaintiff issued press releases for its own peanut butter recall matter that included its yourlawyer.com web address.  Plaintiff contends that it could have serviced these New York residents.

Defendant argues these six New York residents could not have viewed yourlawyer.tv because it had not yet marketed the website (which, as I understand it, means that it had not advertised its services in advertisements that featured the website). But Defendant admits it never asked its New York clients how they learned about its services.  (Orlando Dep. at 43:3-6.)  And Defendant does not dispute that yourlawyer.tv was activated and available for viewing on February 5, 2007, which preceded Defendant's intake of the six New York clients—and Plaintiff's press releases featuring its domain name—by only a matter of weeks.  (Id. at 155:11-23; Waichman Decl. ¶ 13; Pl.'s Ex. F.)  Defendant also acknowledges that, if a viewer directly typed in yourlawyer.tv on February 6 or 7, 2007, the viewer would have been taken to

17

Defendant's www.orlandofirm.com website. Where any doubts exist as to the facts supporting plaintiff's prima facie showing, they must be resolved in the plaintiff's favor. See Hoffritz for Cutlery, 763 F.2d at 57.

Furthermore, Defendant should have reasonably expected its act to have consequences in New York when it "used its [infringing] website to attract and service business across the nation, including in New York." Starmedia Network, 2001 WL 417118, at *3; see also Citigroup, 97 F. Supp. 2d at 568. This "foreseeability" requirement "relates to forum consequences generally and not to the specific event which produced injury within the state." Am. Network, 975 F. Supp. at 497 (internal quotations and citation omitted). New York courts require some discernible effort by the defendant to directly or indirectly serve the New York market. See Kernan, 175 F.3d at 241. The court in American Network found that this requirement was satisfied by "tangible manifestations" of the out-of-state defendant's attempt to reach the New York market. Am. Network, 975 F. Supp. at 498 (citing Martinez v. Am. Standard, 91 A.D.2d 652, 653-54 (N.Y. App. Div. 2d Dep't 1982)).

The "tangible manifestations" in this case are Defendant's statement on its home page that it helps customers "across the country," and its act of signing up six New York clients who allegedly got to it via the website. Id. Furthermore, Orlando admits that Defendant identifies itself as "America's class action lawyer" because "it is [his] intention to reach New York" among its nationwide audience. (Orlando Dep. at 40:11-24).) These are "tangible manifestations" of Defendant's attempts to serve the New York market, and are sufficient to make a prima facie showing of this element. See Am. Network, 975 F. Supp. at 498.

18

Finally, Plaintiff has alleged sufficient facts to show that Defendant derives substantial revenue from interstate commerce. Defendant argues that its operation is "essentially . . . local." (Def.'s Rply Mem. of Law in Supp. of Def.'s Mot. to Dismiss, at 8). and cites, in support. But this case is distinguishable from Bensusan Restaurant Corp. v. King, 126 F.3d 25, 29 (2d Cir. 1997), where the Second Circuit affirmed the dismissal of a complaint for want of personal jurisdiction under Section 302(a)(3) because the non-domiciliary was "unquestionably a local operation," and thus derived no substantial revenue from interstate commerce. There, the out-of-state defendant hired bands of national stature to play at its club and received revenue from University of Missouri students who, while residing in Missouri, were domiciled in various other states. Id.

In this case, unlike Bensusan, there is ample evidence that defendant derives substantial revenue from interstate commerce. Attorneys from Defendant's firm are licensed to practice in six different jurisdictions, and Defendant's own website states that it handles serious injury cases and class action lawsuits "across the country." The website also makes a point to mention that its attorneys apply to be admitted pro hac vice in jurisdictions where they are not admitted to practice law, so that the firm may maintain close oversight and handle its clients personally. (Pl.'s Ex. D at 2.) Furthermore, Defendant represented six New York residents in its peanut butter recall matter, and conducted settlement negotiations in New York for a class action that it ultimately settled for $7 million. (Id. at 75:15-76:16.) Neither party provides information about the fee Defendant was awarded for that settlement. Defendant also opened up a New Jersey office "to attract New Jersey clients" and file mass tort and class actions in New Jersey

19

courts, because there are "a lot of drug companies headquartered in New Jersey" and "good . . . class action and mass tort courts." (Orlando Dep. at 496-50:7.)

"There is no specific dollar threshold at which revenue becomes 'substantial' for purposes of CPLR 302(a)(3)(ii)." Light v. Taylor, No. 05 Civ. 5003, 2007 WL 274798, at *4 (S.D.N.Y. Jan. 29, 2007). Courts instead look to either the percentage of a party's overall revenue derived from interstate commerce, or to the absolute amount of revenue generated by a party's activities in interstate commerce. Under either approach, though, the main concern is the "overall nature of the defendant's business and the extent to which he can fairly be expected to defend lawsuits in foreign forums." Id. (internal quotations omitted). While Plaintiff cannot point to a specific amount of revenue that Defendant has derived from New York clients, it is through no fault of Plaintiff that Defendant does not break down its revenue by state. "[D]ismissal for lack of personal jurisdiction is inappropriate under § 302(a)(3) 'even where there is no proof that a defendant derives substantial revenue from interstate . . . commerce, when that knowledge is peculiarly under the control of [the defendant].'" Energy Brands, 571 F. Supp. 2d at 472 (quoting Mfg. Tech., Inc. v. Kroger Co., No. 06 Civ. 3010, 2006 WL 3714445, at *3 (S.D.N.Y. Dec. 31, 2006)).

Additionally, Defendant's assertion that 98% of its clients are Georgia residents and the majority of the rest are in nearby states, does not foreclose the possibility that the absolute amount of revenue may be substantial. (Orlando Decl. ¶ 16.) Its fee in the class action that was negotiated in New York could have been as high as thirty-three percent, which is over $2 million. Given the evidence before the Court, Plaintiff has adequately shown that Defendant derives substantial revenue from interstate commerce.

Therefore, Plaintiff has made a prima facie showing of each of the four elements under CPLR 302(a)(3)(ii). Defendant can be sued under both provisions of New York's long-arm statute.

## IV.    The Exercise of Personal Jurisdiction is Consistent with Due Process Requirements

Finally, to establish the requisite minimum contacts, an out-of-state defendant must have purposefully availed itself of the privilege of doing business in New York such that it could reasonably anticipate being haled into its courts. Pearson Educ., 525 F. Supp. 2d at 557 (citing Burger King, 471 U.S. at 474-75). The suit must arise out of or be related to these contacts. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415-16 & nn. 9-10 (1984).

As discussed above, Defendant represented New York residents in its business capacity—as a law firm that brings mass tort actions. In securing these New York clients, Defendant sent sign-up packages to New York that contained retainer forms. Based on these acts, Defendant "purposefully directed activity towards New York. If Defendant sought to avoid subjecting itself to suit in New York, it could have chosen not to send those materials there." Am. Network, 975 F. Supp. at 499. Defendant's use of the phrase "across the country" on its website "further support[s] the inference that the New York [clients] are not random or fortuitous, but are rather the result of defendant's purposeful efforts to avail itself of the benefits of New York as part of a nationwide market." Id. And Defendant knew of the existence of Plaintiff since 1999, and knew Plaintiff was a New York firm. (Orlando Dep. at 15:25-17:14, 99:10-14.) Orlando even admits he was "95 percent sure" he knew of Plaintiff's website when he created yourlawyer.tv. (Id. at 25:6-26:20.) Given Defendant's "awareness of Plaintiff's mark

and location," it is "reasonable for defendant to assume that publishing its similar mark on its Web page, which could be viewed from anywhere, might cause harm to a New York corporation and that defendant might then be sued there." Am. Network, 975 F. Supp. at 500.

Finally, none of the reasonableness factors suggest it would offend traditional notions of fair play and substantial justice for this Court to exercise personal jurisdiction over Defendant. Defendant does not specifically address the reasonableness factors in its motion papers, and as far as the Court can tell, the only burden to Defendant would be the general inconvenience of litigating in New York. But given the record, it does not appear that litigating this case in New York would even prove to be such a hardship since Defendant has previously traveled to New York to conduct settlement negotiations and take depositions for cases it has filed in other jurisdictions. Defendant has also "failed to present any evidence to demonstrate that, in this modern age and for a litigant with obvious familiarity with internet communication, litigation in New York would present so great an inconvenience as to constitute a deprivation of due process." Savage Universal Corp. v. Grazier Const., Inc., No. 04 Civ. 1089, 2004 WL 1824102, at *11 (S.D.N.Y. Aug. 13, 2004).

Given the New York courts' interest in adjudicating the federal claims of its plaintiff corporate citizens, the reasonableness factors do not preclude the exercise of personal jurisdiction over defendant. Therefore, Plaintiff has made a prima facie showing that this Court's exercise of personal jurisdiction over Defendant is appropriate under both CPLR 302(a)(1) and 302(a)(3)(ii), and is consistent with due process requirements.

## **CONCLUSION**

For the foregoing reasons, the motion to dismiss for lack of personal jurisdiction is denied.  The Clerk of the Court is directed to remove the motion to dismiss (Docket No. 8) from the Court's active motion list.

Dated: May 14, 2010

_____
U.S.D.J.

BY ECF TO ALL PARTIES